878 F.2d 1436
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Charles H. SISK, Petitioner-Appellant,
v.
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and E.R.
Mining, Inc., d/b/a E.R. Trucking Co.,
Respondents-Appellees.
 No. 88-3982.
 United States Court of Appeals, Sixth Circuit.
 July 13, 1989.
 
 Before NATHANIEL R. JONES and RYAN, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Petitioner-appellant Charles H. Sisk appeals from the decision of the Federal Mine Safety and Health Review Commission which adopted an ALJ's finding that E.R. Mining, Inc. did not discharge Sisk in September of 1986 in violation of Section 105(c)(1) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. Sec. 801 et seq. We affirm.
 
 I.
 
 2
 Mr. Sisk began working as "UKE" truck driver for E.R. Mining, at a non-union surface mine, in June of 1986. He generally worked the 4:00 p.m. until 12:00 a.m. shift. Three days prior to the incident in question, on Friday, September 19, 1986, a tire exploded on the 75 ton haul truck he was driving. Sisk had previously requested that the company repair the tire, but was told that the company was waiting for replacement tires from another mining company. When Sisk arrived for work the day following the tire explosion, a company supervisor assigned him to drive a spare UKE truck. It is undisputed that the brakes on the spare truck required more frequent adjustment than the brakes on the other mining vehicles.
 
 
 3
 Sisk drove the spare truck for part of his shift on Friday, and for full shifts on Saturday and Monday. He testified that he found the braking ability of the truck dangerously insufficient and incapable of holding the loaded truck when it was backed to the edge of a dumpsite. According to Sisk, once on Friday, September 19th, and twice on Saturday, September 20th, he actually backed over the edge of the dump pit due to an inability to stop the spare truck. He testified that it took three bulldozers and a front end loader to pull the truck back up onto the bank. Sisk testified that at various times he "voiced an opinion on the brakes on UKE 751 [the spare truck] to both James and Thomas Beddows," his superiors, but that his comments brought no response.
 
 
 4
 The defendants disagreed. Company officials testified that the first complaint Sisk made concerning the brakes on the spare truck was registered just prior to the beginning of his shift on September 23, 1986, and then only after being informed by Roy Poole that he could not "bump" another driver and drive another truck. One company official testified that after he denied Sisk's request to drive another truck, Sisk walked over to where the trucks were parked and asked the company's contract mechanic, Bill Ryder, to adjust the brakes on the spare truck. Sisk took Ryder to a truck that Ryder began to work on. Subsequently, Sisk discovered that he had taken Ryder to the wrong truck and asked him to go to the spare truck. Ryder told Sisk that he would look at the spare truck as soon as he finished adjusting the brakes on the truck to which Sisk had originally taken him. Testimony indicated that Sisk knew, or should have known, that adjusting the brakes takes about ten minutes. Ryder testified that when Sisk was informed that he would have to wait, he became "loud and abusive." In fact, according to the ALJ, the joint stipulation of facts submitted to him indicated that Sisk "lost his temper and began complaining to Tommy Beddow [the day shift foreman] in a loud and excited voice about working conditions, including the conditions of the brakes." According to the ALJ, the stipulated facts support the following account:
 
 
 5
 Claimant left the area in which Mr. Ryder was working and approached Tommy Beddow, complaining that the brakes were bad on the spare truck but instead of working on it, Mr. Ryder was working on another truck. Claimant told Tommy Beddow that, in the condition that the brakes were in, the risk existed that he could run the spare truck into a piece of equipment or an employee because of his inability to stop it. Claimant was loud and abusive in his speech toward Tommy Beddow and as he did not want claimant operating the spare truck in the mood that he was in, claimant then went to talk to mine superintendent, Jimmy Beddow, and he sent claimant home. Claimant asked him if he were to return the next day and Mr. Beddow told him that he would be contacted. Claimant was discharged on September 25, 1986.
 
 
 6
 Company officials and Sisk also testified that it was company policy to report any equipment problems occurring during a shift by making a notation on the back of the ticket for each shift. It is undisputed that neither Sisk nor the driver for the shift preceding his ever indicated on their shift tickets that they had problems stopping the spare truck. Sisk did, however, note having other problems (exhaust leaks) with the truck. Finally, Roy Poole testified that Sisk only backed over the edge of the pit on one occasion, and never while driving the spare truck.
 
 
 7
 At the conclusion of the testimony, the ALJ concluded that:
 
 
 8
 [t]here is not even sufficient evidence to show that the Complainant engaged in a work refusal. According to the credible testimony of the day shift foremen, Thomas Beddow, Sisk angrily approached him as the second shift was about to begin on September 23rd, and complained that the mechanic was adjusting the brakes on the wrong truck. At one point Sisk, yelled at Beddow that he was going to kill somebody if he drove the truck and Beddow responded--"well don't get in it and don't run it". Shortly thereafter and without determining whether the brakes on his assigned truck had been adjusted Sisk just drove off the premises in his own truck.
 
 
 9
 In any event, even assuming, arguendo that Sisk did refuse to drive the subject truck it is clear that he could not have then entertained either a reasonable or a good faith belief that it would have been hazardous to do so. Sisk admitted that it was standard company procedure for the drivers to test the brakes on any vehicle on the way to the pit and at that point if they were not working properly management would be asked to correct the problem. It is undisputed in this case that not only had Sisk not yet driven the truck that day in accordance with normal brake test procedures but that he had not checked the subject brakes in any way.
 
 II.
 
 10
 Section 106 of the 1977 Mine Act provides that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.S.C. Sec. 816(a)(1). Of course this court reviews de novo for errors of law.
 
 
 11
 Section 105(c)(1) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. Sec. 801 et seq., provides in pertinent part:
 
 
 12
 No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this Act because such miner, representative of miners or applicant for employment, has filed or made a complaint under or related to this Act, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine ... or because of the exercise by such miner, representative of miners or applicant for employment on behalf of himself or others of any statutory right afforded by this Act.
 
 
 13
 In order to establish a prima facie violation of this statute, Sisk had to prove by a preponderance of the evidence that his discharge was motivated, at least in part, by the fact that he engaged in a protected activity. Secretary on behalf of Pasula v. Consolidation Coal Co., 2 FMSHRC 2786 (1980), rev'd on other grounds sub nom., Consolidation Coal Co. v. Marshall, 663 F.2d 1211 (3d Cir.1981); Secretary on behalf of Robinette v. United Castle Coal Co., 3 FMSHRC 803 (1981). In this case, Sisk argues that the protected activity in which he engaged and which improperly motivated his discharge was his refusal to work on a truck that he reasonably and in good faith believed to be unsafe.
 
 
 14
 Although the Mine Act does not explicitly provide miners the right to refuse to work, the Third Circuit has noted that "the legislative history of the Mine Act shows that there was widespread support for the right of an employee to walk off the job when confronted with dangerous or unhealthful working conditions at the time the 1977 amendments were made...." Consolidated Coal Co. v. Marshall, 663 F.2d 1211, 1216 n. 6 (3d Cir.1981). It is now generally accepted that "30 U.S.C. Sec. 815(c)(1) grants an individual miner the right to refuse to perform work which he reasonably and in good faith believes threatens his health or safety." Consolidation Coal Co. v. Federal Mine Safety & Health Review Comm'n, 795 F.2d 364, 366 (4th Cir.1986). See also Gilbert v. Federal Mine Safety & Health Rev. Comm'n, 866 F.2d 1433, 1439 (D.C.Cir.1989); Miller v. Federal Mine Safety & Health Rev. Comm'n, 687 F.2d 194, 195 (7th Cir.1982); Dunmire and Estle v. Northern Coal Co., 4 FMSHRC 126 (1982). We agree that the Mine Act sometimes permits a miner to refuse to work.
 
 
 15
 Assuming that refusing to work may sometimes be considered a protected activity under the Mine Act, the question remains whether Sisk ever engaged in a possibly protected activity by actually refusing to work. The ALJ concluded that he had not. Substantial evidence supports that conclusion.
 
 
 16
 Thomas Beddow testified that when Sisk complained to him:
 
 
 17
 Sisk was pretty upset, and he was letting me know real quick that he didn't like the idea of Ryder tightening them brakes, when he wanted him to tighten them on 51, and that, "If I have to run 51 with no brakes on it, I'll just run over somebody and kill them." And that's when I proceeded telling him, "Charles, you're in a ..." He was just in a bad mood, and anybody that felt like that, I didn't want them on a piece of equipment. I told him I'd be back in a few minutes to talk to him, ... [but] [w]hen I came back ... Charles was going out the haul road.
 
 
 18
 Sisk's testimony obviously differed. He testified that after he reported the brake situation of Tommy Beddow, Beddow responded: "[w]ell, if you don't want to run that truck the way it is right now, then get the hell out of here and don't come back." Apparently, the ALJ found the testimony of Beddow to be more credible. We find in Beddow's credited testimony substantial evidence to support the ALJ's determination that Sisk was never actually told to drive an unsafe truck, and never actually refused to drive a truck that he reasonably considered to be unsafe.
 
 
 19
 The ALJ's determination, which the Federal Mine Safety and Health Review Commission adopted, that Sisk never engaged in a protected activity and that therefore the company could not have discharged him in violation of the Act, is AFFIRMED.