*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LAWRENCE L. PENDLEY,

                    *Petitioner,*

       *v.*

FEDERAL MINE SAFETY & HEALTH REVIEW
COMMISSION et al.,

                    *Respondents.*

No. 09-3213

> On Petition for Review of an Order of the
> Federal Mine Safety & Health Review Commission.
> No. KENT 2006-506-D; KENT 2007-383-D.
>
> Submitted: January 15, 2010
>
> Decided and Filed: April 2, 2010
>
> Before: BOGGS and GILMAN, Circuit Judges; McCALLA, Chief District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Wes Addington, APPALACHIAN CITIZENS LAW CENTER, Whitesburg, Kentucky, for Petitioner. Melanie J. Kilpatrick, RAJKOVICH, WILLIAMS, KILPATRICK & TRUE, PLLC, Lexington, Kentucky, for Respondents. Deborah Stern, UNITED MINE WORKERS OF AMERICA, Fairfax, Virginia, for Amicus Curiae.

     McCALLA, Chief D. J., delivered the opinion of the court, in which GILMAN, J., joined. BOGGS, J. (pp. 18-20), delivered a separate opinion concurring in part and dissenting in part.

_____

[*] The Honorable Jon P. McCalla, Chief United States District Judge for the Western District of Tennessee, sitting by designation.

1

———————————

**OPINION**

———————————

JON P. McCALLA, Chief District Judge.  This cause is before the Court on a petition for review of an order of the Federal Mine Safety & Health Review Commission (the "Commission").  Petitioner Lawrence L. Pendley, a coal miner, was terminated by his former employer Highland Mining Co. near the time that he both made federally protected safety complaints and engaged in significant workplace misconduct.  Petitioner was temporarily reinstated, and he claims thereafter to have suffered additional discrimination for raising safety concerns.  Petitioner's claims were heard first by a Commission administrative law judge ("ALJ"), who ruled against Petitioner in part.  The ALJ's decision was appealed to the Commission, which affirmed the ALJ.  Petitioner now seeks this Court's review.

**I. BACKGROUND**

**a. Factual Background**

Petitioner began working at Highland's No. 9 Mine, located near Morganfield, Kentucky, in 2004.  He started as a "roof bolter" and later became a "maintenance parts runner," a position in which he delivered parts and supplies to miners working underground.  Beginning in May 2005, a series of physical and verbal incidents occurred between Petitioner and another miner, Jack Creighton.  Late in 2005, mine management met with both miners and issued each a written "last and final warning" that further misconduct would lead to termination.

On November 29, 2005, Petitioner claimed to have been injured in a mine accident; he was riding a mantrip, a car that carries miners underground, which allegedly came to a sudden stop and injured his back.  There was some dispute among miners, mine officials, and government investigators as to whether the mantrip stopped as Petitioner claimed.  Shortly after the alleged accident, Petitioner returned to the surface

and completed an accident report with the aid of a supervisor. Petitioner claims that when he later asked for a copy of the report, Highland's safety manager refused to give it to him and said that the report was "company material."

On December 15, 2005, Petitioner filed a safety complaint with the Mine Safety & Health Administration ("MSHA"). Another miner testified before the ALJ that it was widely known that Petitioner had spoken to MSHA. The MSHA inspector determined that Highland had failed to report the mantrip incident. On December 20, 2005, MSHA cited Highland for failing to report a mine accident in violation of 30 C.F.R. Part 50. MSHA thereafter opened a wider investigation of Highland's No. 9 mine and issued four other safety citations.

On December 21, 2005, a Highland manager singled Petitioner out for discipline. Petitioner signed in to work between 12:50 and 12:55 P.M. and marked his sign-in time as 1:00 P.M., which under the labor contract meant he would be paid from 1:00 P.M. There was testimony before the ALJ that it was customary to "round" the sign-in time to the nearest hour as Petitioner did. Since it was cold outside, and the mantrip was not available to transport Petitioner underground, Petitioner waited indoors in the commons area, a small room with a window through which miners could see the mine entrance and mantrip loading area. There was testimony that waiting indoors was the customary practice. Two other miners signed in shortly after Petitioner and waited with him. A few minutes after 1:00 P.M., Highland manager David Webb entered the commons area and chastised only Petitioner for waiting in the commons area after having signed in to work. Webb suspended Petitioner for three days. Webb claimed not to have seen the other miners with Petitioner, but the ALJ found Webb's testimony not credible.

The next day, December 22, 2005, Petitioner complained to the Secretary of Labor that Highland suspended him because he had engaged in protected activity; that is, because he asked for a copy of the mantrip accident report. On September 25, 2006, the Secretary filed a Mine Act Section 105(c) discrimination complaint, broadening Petitioner's complaint and alleging that Petitioner was suspended in retaliation for

raising safety concerns. The Secretary and Highland settled that dispute, and a Commission ALJ approved the settlement on January 18, 2007. On February 11, 2007, however, Petitioner asked the Commission to vacate the settlement because he had not agreed to it and because he felt that it did not fully compensate him for his losses. The Commission ordered review of the issue on February 26, 2007, and on April 3, 2007 vacated the settlement and remanded the matter to the ALJ for further proceedings.

Several important events happened while Petitioner's petition to reopen his first Section 105(c) claim was pending. First, on March 19, 2007, Petitioner was involved in a verbal dispute with mine office staff regarding the payment of overtime wages. Two days later, Petitioner again was involved in a heated discussion with mine office staff about the payment of his overtime wages. After this second encounter with the mine office staff, Petitioner went to look for mine superintendent Larry Millburg because the office staff had told Petitioner that only Millburg could resolve the overtime issue. Petitioner could not find Millburg, so he dressed to descend into the mine and went outdoors to the mantrip loading area. When he was unable to immediately board a mantrip car, he returned to the office and resumed his verbal confrontation with the mine office staff.

Petitioner then left the office and returned to the mantrip load area to descend into the mine. When Petitioner arrived at the mantrip load area, mine personnel were conducting a safety test of the hoist. Creighton, with whom Petitioner had had previous altercations, was near or in the "slope shack" – an open structure that houses the controls for the mantrip cars. According to a surveillance tape, Petitioner waited for one minute and twenty seconds before approaching the slope shack and pushing the button to call the mantrip. Petitioner and Creighton had some hostile physical contact – pushing and shoving – at the slope shack. At the hearing before the ALJ, there was conflicting evidence both as to whether it would have been apparent to Petitioner that the hoist test was in progress and as to whether Petitioner or Creighton began the pushing and shoving.

While these events were taking place, a MSHA inspector was at the mine conducting a Mine Act Section 103(g) safety inspection in response to the earlier request by Petitioner. The inspector completed his inspection and cited Highland for a safety violation. After the inspector delivered the citation to mine officials, mine superintendent Millburg summoned Petitioner to the office and gave Petitioner a termination letter indicating that, in accordance with the collective bargaining agreement, Petitioner would be suspended with intent to terminate his employment. Millburg's letter gave three reasons for the discipline: "[1] Harassment of office staff; [2] Interferrence [sic] with safety check of hoist potentially endangering the safety of those conducting the test; [3] Assaulting another employee." After the meeting with Millburg and Petitioner's union representatives, Petitioner left the mine. At the hearing before the ALJ, Millburg testified that he did not learn of the safety citation until after he had given Petitioner the termination letter.

The next day, March 22, 2007, Petitioner again complained to the Secretary of Labor, asserting that he had been discriminated against for reporting mine safety violations. In response, the Secretary filed a second Section 105(c) discrimination complaint against Highland. Section 105(c)(2) of the Mine Act provides that a miner may be temporarily reinstated during the pendency of a Mine Act suit. 30 U.S.C. § 815(c)(2). Petitioner was reinstated under this section and returned to the No. 9 mine in June 2007.

After Petitioner returned to Highland, he claims to have been subjected to further discrimination in the form of changed job duties, excessive supervision, and the posting of his job duties on a company bulletin board. These post-reinstatement accusations form the basis for Petitioner's third Section 105(c) discrimination claim.

**b. Procedural Background**

### 1. The Adjudicatory Process Under the Mine Act

Section 105(c) of the Mine Act "protects both miners and their representatives from discharge or any other form of interference or discrimination because of the exercise of a statutory right afforded by the [Mine] Act, including rights related to safety . . . ." *Council of So. Mountains, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 751 F.2d 1418, 1420-21 (D.C. Cir. 1985) (citations omitted).

A miner who believes that he was discriminated against after raising a safety concern may file a complaint to that effect with the Secretary of Labor. 30 U.S.C. § 815(c)(2). If the Secretary determines after an investigation that a violation has occurred, the Secretary "shall file a complaint with the Commission . . . ." *Id.* The Commission appoints ALJs to hear such matters in bench-trial-type proceedings, where they decide questions of fact and law. *See* 30 U.S.C. § 823(d)(1); *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 152 (10th Cir. 2006).

A party may appeal the ALJ's order to the Commission, which has discretion to grant or deny review. 30 U.S.C. § 823(d). If no appeal is brought or if the Commission declines to review the ALJ's decision, the ALJ's order will become the final decision of the Commission after forty days. 30 U.S.C. § 823(d)(1). An aggrieved or interested party may petition for review of the Commission's order in the U.S. Court of Appeals for the circuit where the alleged Mine Act violation occurred or in the D.C. Circuit. 30 U.S.C. § 816(a)(1).

### 2. The Administrative Law Judge's Order

The Secretary of Labor brought three Section 105(c) claims against Highland Mining Co. and three Highland managers (collectively "Highland"). The Secretary's first claim asserted that Highland discriminated against Petitioner by suspending him for three days on December 21, 2005 after he engaged in the protected activity of making safety complaints. The second claim alleged that Highland discriminated against

Petitioner by suspending him and terminating his employment on March 21, 2007. The third claim asserted that Highland continued to discriminate against Petitioner after he was temporarily reinstated.

In an Interim Decision on Liability issued May 19, 2008, the ALJ found that Highland discriminated against Petitioner with regard to the December 21, 2005 suspension. The ALJ found, however, that Highland did not discriminate against Petitioner with regard to the March 21, 2007 suspension and termination or with regard to Highland's post-reinstatement conduct.

### 3. The Commission's Order

Both the Secretary and Petitioner appealed the ALJ's order, and the Commission granted discretionary review. The Secretary challenged the ALJ's ruling that Highland did not discriminate against Petitioner when it suspended and terminated him on March 21, 2007. Petitioner, through private counsel, challenged the ALJ's finding that Highland did not discriminate against Petitioner after he was temporarily reinstated. Highland did not appeal the ALJ's decision with regard to Petitioner's first claim. The Commission affirmed the ALJ's order in a 2-1 decision. This petition for review followed. The Secretary declined to participate here and the Commission indicated that it would not be an active litigant.

## II. ANALYSIS

### a. Standard of Review

The standard under which this Court reviews the Commission's order is governed by the Mine Act and general administrative law principles, although the Administrative Procedure Act's judicial review provisions do not apply here, 30 U.S.C. § 956. This Court reviews the Commission's decision and not the underlying decision of the ALJ as such. *See* 30 U.S.C. § 816(a)(1) ("Any person adversely affected or aggrieved by an order of the Commission . . . may obtain a review of such order in [the court of appeals]."); *RAG Cumberland Res. LP v. Fed. Mine Safety & Health Review Comm'n*,

272 F.3d 590, 595-96 (D.C. Cir. 2001) (explaining that the court of appeals reviews the Commission's decision, which for its part reviews the ALJ's decision).[1]

This Court applies a deferential standard to the Commission's factual determinations. "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.SC. § 816(a)(1). "Substantial evidence is determined by evaluating whether there is such relevant evidence as a reasonable mind might accept as adequate to support the [Commission's] conclusion." *Nat. Cement Co. v. Fed. Mine Safety & Health Review Comm'n*, 27 F.3d 526, 530 (11th Cir. 1994) (quoting *Chaney Creek Coal Corp. v. Fed. Mine Safety & Health Review Comm'n*, 866 F.2d 1424, 1431 (D.C. Cir. 1989) (quotation marks omitted)).

The standard for assessing the Commission's legal determinations is more nuanced. This Court reviews the Commission's application of the law de novo. *Olson v. Fed. Mine Safety & Health Review Comm'n*, 381 F.3d 1007, 1011 (10th Cir. 2004) (citations omitted); *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1100 (D.C. Cir. 1998) (citations omitted); *Collins v. Fed. Mine Safety & Health Review Comm'n*, 42 F.3d 1388, at *3 (6th Cir. 1994) (unpublished table decision). The Court must, however, give *Chevron* deference to the Commission's reasonable interpretation of ambiguous provisions of the Mine Act.[2] *See Boich v. Fed. Mine Safety & Health Review Comm'n*, 719 F.2d 194, 196 (6th Cir. 1983)[3]; *see also Olson*, 381 F.3d at 1011.

---

[1] Petitioner addressed his objections to the ALJ's order. To the extent possible the Court construes Petitioner's challenges to the ALJ's decision as challenges to the corresponding portions of the Commission's order. *See Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650-51 (6th Cir. 2007) (construing litigant's poorly-articulated argument to mean what the litigant intended to argue).

[2] The Secretary of Labor's reasonable interpretation will supersede that of the Commission. *See, e.g.*, *Sec'y of Labor ex rel. Bushnell v. Cannelton*, 867 F.2d 1432, 1435 (D.C. Cir. 1989) (Ginsburg, R.B., J.). No such conflict is presented here.

[3] While *Boich* predates *Chevron U.S.A., Inc., v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *Chevron*'s core principle that reviewing courts should defer to reasonable agency interpretations of the statutes they administer was not new in 1984. *See, e.g.*, *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978).

### b. Discussion

Courts analyze Section 105(c) claims such as Petitioner's under the *Pasula-Robinette* framework. *Collins v. Fed. Mine Safety & Health Review Comm'n*, 42 F.3d 1388 (6th Cir. 1994) (unpublished per curiam table decision) (citing *Sec'y of Labor ex rel. Pasula v. Consolidation Coal Co.*, 2 F.M.S.H.R.C. 2786, *rev'd on other grounds*, 663 F.2d 1211 (3d Cir. 1981); *Sec'y of Labor ex rel. Robinette v. United Castle Coal Co.*, 3 F.M.S.H.R.C. 803 (1981)); *see also E. Assoc. Coal Corp. v. Fed. Mine Safety & Health Review Comm'n*, 813 F.2d 639, 642 (4th Cir. 1987) (recognizing *Pasula-Robinette* as the proper framework for Section 105(c) claims). Under *Pasula-Robinette*, a miner establishes a prima facie case of discrimination by showing (1) that he engaged in protected activity, and (2) that he thereafter suffered adverse employment action that was motivated in any part by that protected activity. *Driessen v. Nev. Goldfields, Inc.*, 20 F.M.S.H.R.C. 324, 328 (1998); *accord Collins*, 42 F.3d 1388, at *2.

"The mine operator may rebut the prima facie case by showing either that no protected activity occurred or that the adverse action was in no part motivated by protected activity." *Nev. Goldfields*, 20 F.M.S.H.R.C. at 328 (citing *Robinette*, 3 F.M.S.H.R.C. at 818 n.20). The mine operator may also raise the affirmative defense that although the operator "was motivated by the miner's protected activity, [it] would have taken the adverse action for the unprotected activity alone." *Id.* (citations omitted). In other words, the operator may show that while it took adverse action against the miner because of the miner's protected activity, it would have taken that action even if the miner had not engaged in protected activity. In asserting that defense, "[i]t is not sufficient for the employer to show that the miner deserved to have been fired for engaging in the unprotected activity . . . . The employer must show that he did in fact consider the employee deserving of discipline for engaging in the unprotected activity alone and that he *would* have disciplined him in any event." *Pasula*, 2 F.M.S.H.R.C. at 2800.

**1. The Commission's Rulings on Petitioner's 2007 Termination**

Petitioner points to several alleged errors in the Commission's analysis of the ALJ's decision with regard to Petitioner's 2007 termination. First, Petitioner claims that the ALJ improperly imputed knowledge of Petitioner's 2005 warning letter to Millburg. Second, Petitioner claims that the ALJ improperly "reformulated" Highland's assault accusation. Third, Petitioner claims that the ALJ improperly substituted his own judgment for that of Highland in assessing whether Highland would have disciplined Petitioner for his unprotected activities alone.

**A. The 2005 Warning Letter**

The Commission did not commit reversible error with regard to the ALJ's discussion of the 2005 warning letter. As noted above, in 2005 Petitioner was warned that further infractions of workplace rules would lead to his termination. Highland manager Millburg was unaware of this letter when he decided to terminate Petitioner's employment. The discriminatory motivation inquiry turns on the mind of the decision-maker, so a warning letter of which Millburg was unaware would be irrelevant to analyzing his state of mind under *Pasula-Robinette*. The ALJ nonetheless mentioned the warning letter in his discussion of Millburg's decision to terminate Petitioner. According to the ALJ, Petitioner "was on notice" of the possibility that he might be terminated, yet Petitioner "persisted in the very behavior about which he was warned."

On appeal to the Commission, the Secretary challenged the ALJ's discussion of the 2005 warning letter. The Commission found that the ALJ discussed the warning letter to highlight Petitioner's culpability, and that consideration of the letter was appropriate under *Pasula-Robinette* because an operator may establish that discipline was non-pretextual by showing that it was consistent with prior warnings.

The Commission's second rationale is inapposite to Petitioner's objection. Whether the discipline was consistent with the 2005 warning letter does not speak to why the ALJ would have mentioned a letter of which Millburg was unaware in analyzing

Millburg's motivation for acting. Nonetheless the Commission's first rationale is sufficient to rebut Petitioner's objection. The appropriate reading of the ALJ's order under the applicable standard is that the ALJ was engaging in superfluous criticism of Petitioner's culpability, not suggesting that Millburg considered the letter in making his decision to discipline Petitioner.

## B. "Reformulation" of the Assault Accusation

The Commission did not commit reversible error with regard to what Petitioner calls the ALJ's "reformulation" of Highland's assault accusation. One of the three bases for discipline Highland offered was that Petitioner had "assaulted" another employee, Creighton. The ALJ could not determine which miner pushed the other first at the slope shack, but found that Petitioner initiated the physical "altercation" by "charg[ing]" the slope shack.

Petitioner now argues that the description of the incident as an "altercation" rather than an "assault" is important for two reasons. First, he argues that assault connotes that Petitioner was the aggressor and altercation does not; and that if Petitioner was not the aggressor, there may be a case for disparate treatment because Petitioner was disciplined and Creighton was not. Petitioner's argument is not convincing. This was not a case of disparate treatment that the Commission and the ALJ failed to grasp because Petitioner and Creighton were not similarly situated. Even if both miners had been equally at fault for the physical altercation, Petitioner had twice that day had verbal altercations with mine office staff; Creighton had not. *See Pero v. Cyprus Plateau Mining Corp.*, 22 F.M.S.H.R.C. 1361, 1372 (2000) (miners are similarly situated when they have engaged in conduct of "comparable seriousness").

The second argument Petitioner advances is that by "reformulating" Highland's accusation, the ALJ supplied a different rationale than that offered by the operator, and thus failed to examine Highland's asserted justification for evidence of pretext. Contrary to Petitioner's characterization, the ALJ did not reformulate Highland's assault accusation. Instead the ALJ found that Petitioner "charge[d]" Creighton's location at

the slope shack, which appears to satisfy the definition of assault under Kentucky law. *See Crumes v. Commonwealth*, No. 2003-SC-0336-MR, 2005 WL 2316192, at *6 (Ky. 2005) ("A person is guilty of menacing [which replaced common law assault] when he intentionally places another person in reasonable apprehension of imminent physical injury.") (quoting Ky. Rev. Stat. Ann. § 508.050).    Accordingly, Petitioner's "reformulation" argument fails.

### C. Highland's Asserted Justification for Terminating Petitioner

Petitioner is correct, however, that the Commission committed reversible error with regard to the ALJ's analysis of Highland's three-part justification for terminating Petitioner.  In analyzing an operator's asserted justification for taking adverse action under *Pasula-Robinette*, the inquiry is limited to whether the reasons are plausible, whether they actually motivated the operator's actions, and whether they would have led the operator to act even if the miner had not engaged in protected activity.  *Sec'y of Labor ex rel. Chacon v. Phelps Dodge Corp.*, 3 F.M.S.H.R.C. 2508, 2516 (1981), *rev'd on other grounds*, 709 F.3d 86 (D.C. Cir. 1983).  The Commission may not impose its own business judgment as to an operator's actions.  *Id*.  Further, under *Secretary of Labor ex rel. McGill v. U.S. Steel Mining Co.*, 23 F.M.S.H.R.C. 981 (2001), the Commission may not substitute its own justification for disciplining the miner over that offered by the operator.  *Id*. at 989.

The termination letter that Millburg gave Petitioner on March 21, 2007 listed three reasons for the discipline: "[1] Harassment of office staff; [2] Interferrence [sic] with safety check of hoist potentially endangering the safety of those conducting the test; [3] Assaulting another employee."  The structure of the letter and Millburg's testimony suggest that the three reasons were not independently sufficient to motivate the termination.  Millburg testified that "Whenever I issued -- whenever I made my decision to issue this -- this letter to suspend with intent to discharge, yes, that was -- that was my decision on -- based on these three -- three things right here."  That is also how the ALJ construed Highland's asserted justification, noting that "Millburg also based his decision

to suspend and discharge Petitioner in part on Petitioner's interference with a hoist test
. . . ."

Nonetheless, the ALJ determined that while only two of the three reasons were credible, those two without the third were sufficient to have motivated the discipline. The ALJ discredited the safety-test justification, but explained that "it was enough, in my view, that Petitioner was involved in the oral altercation with the office employees and the physical altercation with Creighton." The Commission affirmed, arguing that the ALJ need not "adopt every reason given by the operator in order to sustain the discipline."

The Commission's decision is inconsistent with its own case law. Under *McGill* and *Chacon*, the Commission may not disbelieve part of an operator's justification but nonetheless hold that in the Commission's own view *part* of the asserted justification was "enough" to support the adverse action. The inquiry turns on what the operator actually believed at the time, not what the Commission later reasons the operator *could* have relied upon in making its disciplinary decision.[4] *Pasula*, 2 F.M.S.H.R.C. at 2800. In affirming the ALJ, the Commission at the very least departed from its own precedent without articulating a reasoned basis for doing so.

The Court therefore remands this matter to the Commission to reexamine its decision in light of its own precedent. *See Michigan v. Thomas*, 805 F.2d 176, 184 (6th Cir. 1986) (noting that agencies must provide an "explicit[] and rational[]" justification for departing from their precedents); *see also Leeco, Inc. v. Hays*, 965 F.2d 1081, 1085 (D.C. Cir. 1992) ("It is especially important in cases where the agency has take a sharp turn from prior holdings that its actions be supported by reasoned decision-making.") (citation omitted).

---

[4]Highland's reliance on *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994), is misplaced. In *Cooley*, this Court indicated that "[w]here two or more *alternative and independent* legitimate, nondiscriminatory reasons are articulated by the defendant employer, the falsity or incorrectness of one may not impeach the credibility of the remaining articulated reason(s)." 25 F.3d at 1329 (emphasis added). As explained above, that is not the case here; these have not been shown to be alternative and independent reasons, but are, according to the decision-maker's testimony, cumulative reasons for termination.

## 2. Post-Reinstatement Working Conditions

Petitioner, supported on this point by amicus curiae United Mine Workers, argues next that the Commission erred in finding that Petitioner's post-reinstatement working conditions did not constitute adverse action. Under the Mine Act "an adverse action is an act of commission or omission by the operator subjecting the affected miner to discipline or a detriment in his employment relationship." *Sec'y of Labor ex rel. Jenkins v. Hecla-Day Mines Corp.*, 6 F.M.S.H.R.C. 1842, 1847-48 (1984). After his reinstatement, Petitioner was assigned new job duties, although it is not clear what his entire post-reinstatement duties were. The Commission ruled that Petitioner's new job duties were not adverse action because they were within his job classification, were not more responsibility than he could handle in a eight-hour shift, and there was no evidence to support a finding that Petitioner's new assignments were motivated by his protected activity.

### A. Duties that Were Within Petitioner's Job Classification

The Commission's ruling as to Petitioner's job classification is inconsistent with Mine Act precedent. In *Secretary of Labor ex rel. Glover v. Consolidation Coal Co.*, 19 F.M.S.H.R.C. 1529, 1531-35 (1997), the Commission held that the transfer of miners to jobs that were within their job classification but were more dangerous and less desirable was adverse action, which contradicts the Commission's holding that Petitioner's assignments were not adverse action because they were within his job description.[5] The Commission failed to resolve or even acknowledge this tension. On remand the Commission should reexamine its finding on this issue in light of the applicable precedent. *See Michigan*, 805 F.2d at 184.

---

[5]The partial dissent reads *Glover* as holding that new duties that are within a miner's job classification cannot be adverse action if those duties are not more dangerous than the old ones. *Glover* does not stand for that principle, as Commissioner Jordan's dissent below recognized. Consider a miner whose job duties include working in the mine shaft and custodial work, and who makes protected safety complaints. Under the partial dissent's interpretation of *Glover*, the operator could force the miner to spend all of his work shifts cleaning lavatories – likely a less dangerous but more onerous and distasteful task – without that re-assignment of job duties constituting adverse action. Such a conclusion is not mandated by the holding in *Glover*.

### B. Duties that Can Be Completed Within a Normal Work Shift

Petitioner also challenges the Commission's ruling that his post-reinstatement duties were not adverse action because he could complete his assigned tasks within a normal eight-hour work shift.[6] This too is reversible error. *Glover*, the Commission's leading case on dangerous or arduous work conditions as adverse action, does not contain or imply the limiting principle that the Commission applied to Petitioner's case. Further, the Commission provided no reasoning for what on its face is a questionable rule. It is easy to imagine dangerous or arduous but quick-to-complete tasks that would constitute adverse action under any reasonable interpretation of the Mine Act. Again, the Commission must consider its own precedent and the purposes of the Mine Act in examining this issue. *See Ky. Utils. Co. v. I.C.C.*, 721 F.2d 537, 545 (6th Cir. 1983) ("[I]t is undisputed that judicial deference is extended only to reasoned agency decisions.").

### C. Evidence of Discriminatory Intent

The Commission's holdings with regard to the job description and work-shift questions caused a secondary problematic effect. The Commission held that even if Petitioner had suffered post-reinstatement adverse action, there was no evidence of discriminatory intent. But under Commission precedent, "coincidence in time between the protected activity and the adverse action" may show discriminatory intent. *Sec'y of Labor ex rel. Garcia v. Colo. Lava, Inc.*, 24 F.M.S.H.R.C. 350, 354 (2002) (citation omitted). Thus, if Petitioner's new duties were adverse action as discussed above, the temporal proximity between that adverse action and his protected activity may well have established the requisite discriminatory intent. *See id.* On remand, the Commission will

---

[6] We do not take issue with the partial dissent's argument that mine operators should be able to "respond to allegations that they are overworking an employee by pointing out that the employee's duties can be accomplished within his scheduled shift." This argument is distinct from the holdings of the decisions below. The ALJ, affirmed by the Commission, rejected Petitioner's complaint that his work load increased because Petitioner could accomplish his new tasks within an eight-hour work shift. Simply because a miner may complete his new tasks within a work shift does not mean that his work load did not increase and that such an increase was not a "detriment in his employment relationship." *Hecla-Day Mines Corp.*, 6 F.M.S.H.R.C. at 1847-48.

therefore need to consider whether, if Petitioner did indeed suffer adverse action, the proximity in time between his protected activity and that adverse action establishes discriminatory intent under *Colorado Lava*.

### D. The Glue Incident

Petitioner also claims that the ALJ erred by failing to consider relevant evidence that he was "singled out" by Highland management. This objection does not merit reversal of the Commission's order. Petitioner points only to an incident where he was allegedly required to move a pallet of glue by hand rather than with a forklift. Petitioner cannot raise this objection here because he failed to raise it before the Commission. *See* 30 U.S.C. § 816(a)(1) ("No objection that has not been urged before the Commission shall be considered by the court [of appeals] . . . . ").

### 3. The Mine Act and *Burlington Northern & Santa Fe Railway Co. v. White*

Petitioner and amicus curiae United Mine Workers argue that the Commission should have analyzed Petitioner's allegations of adverse action under the "objective reasonable worker standard" from the Supreme Court's opinion in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). Together Petitioner and the United Mine Workers effectively urge this Court to hold that *Burlington Northern* applies to Mine Act Section 105(c) cases. As noted above, adverse action is defined under the Mine Act as "an act of commission or omission by the operator subjecting the affected miner to discipline or a detriment in his employment relationship." *Sec'y of Labor ex rel. Jenkins v. Hecla-Day Mines Corp.*, 6 F.M.S.H.R.C. 1842, 1847-48 (1984). By contrast, the *Burlington Northern* Court explained that Title VII's anti-retaliation prong extends to adverse actions beyond the workplace, but only to those actions that are "materially adverse, which in this context means [they] might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (citations and internal quotation marks omitted).

The Court declines to hold that *Burlington Northern* applies under the Mine Act for two reasons. The first reason stems from the role that the Secretary and the Commission play in interpreting the Mine Act. The Secretary and the Commission, not this Court, have primary authority for interpreting the Mine Act in light of their relative expertise in the area. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 214 (1994) (noting that Congress intended the Commission to use its expertise to "develop a uniform and comprehensive interpretation of the Mine Act"); *Sec'y of Labor v. Ohio Valley Coal Co.*, 359 F.3d 531, 534-35 (D.C. Cir. 2004) (noting that Congress intended that "the Secretary's interpretation of the [Mine Act] shall be given weight by both the Commission and the courts.") (citations and internal quotation marks omitted); *Boich v. Fed. Mine Safety & Health Review Comm'n*, 719 F.2d 194, 196 (6th Cir. 1983) (deferring to the Commission's reasonable interpretation of the Mine Act).[7] A fundamental change in Mine Act jurisprudence of the sort Petitioner and the United Mine Workers seek ought first to be considered by the Secretary and the Commission, neither of whom is an active litigant here.

Secondly, it is unnecessary to decide the *Burlington Northern* question here. The Court can resolve the questions presented by Petitioner's case on the grounds noted above, namely that the Commission failed to follow or distinguish its own precedent and failed to articulate its reasoning.

### III. CONCLUSION

For the foregoing reasons, Petitioner's petition for review is **GRANTED IN PART** and **DENIED IN PART**. The Commission's order is **REVERSED** and the matter is **REMANDED** to the Commission for further proceedings consistent with this opinion.

---

[7] In two unpublished opinions, this Court interpreted the Mine Act as an original matter without regard to the prerogative of the Secretary or the Commission. *See Collins v. Fed. Mine Safety & Health Rev. Comm'n*, 42 F.3d 1388, at *3-5 (6th Cir. 1994) (unpublished per curiam table decision); *Sisk v. Fed. Mine Safety & Health Rev. Comm'n*, 878 F.2d 1436, at *3 (6th Cir. 1989) (unpublished table decision). Both decisions are non-binding precedent, and neither acknowledges the *Chevron* issue. As such, they do not compel this Court to engage in the sort of primary Mine Act interpretation that Petitioner and the United Mine Workers request.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

BOGGS, Circuit Judge, concurring in part and dissenting in part. I join the majority's opinion as to all matters except those discussed in Parts II.b.2.A–C. I agree that the Commission erred in affirming the ALJ's decision as to Highland's decision to terminate Pendley; the decision-maker put forth cumulative reasons for termination that the ALJ effectively treated as independent and severable, and hence I concur in the order remanding to the Commission to explain the apparent discrepancy between its decision and its previous holdings *McGill* and *Chacon*. I further agree that prudential concerns counsel against our deciding the question of whether the "objective reasonable worker standard" enunciated by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White* applies to cases brought under Section 105(c) of the Mine Act.

I disagree, however, with the majority's treatment of the Commission's decision as to Pendley's post-reinstatement working conditions, and would hold that there was no error in the Commission's determination that Pendley's assignment to new duties upon reinstatement was not "adverse action" under the Mine Act. In particular, the majority would read the decision of the Commission as holding that Pendley's new working conditions were not adverse action merely because they were within his job classification or, alternatively, because they were not more responsibility than he could handle in an eight-hour shift.

I do not read the Commission's decision as resting solely on those considerations. In fact, the discussions in the opinions below of Pendley's job classification and ability to handle his new duties within an eight-hour shift are themselves responses to Pendley's *own* arguments that those duties were distasteful and/or represented an increased workload. It is illogical to believe that a company cannot respond to allegations that they are overworking an employee by pointing out that the employee's duties can be accomplished within his scheduled shift, or that it cannot

counter accusations that an employee's job duties are particularly arduous or demeaning by pointing out, as Highland did, that they are within the employee's job description and have been performed by others with that same job description.

Nor is Commission precedent to the contrary. The majority correctly identifies *Glover* as the most on-point decision in this case, but, in my view, the majority misconstrues *Glover*. The Commission in that case had before it a situation in which mine mechanics had been transferred from a relatively safe "shop area that measure[d] 18 feet by 70 feet with rock walls, a beamed ceiling, and a cement floor" to an area in the working section of the mine, "where they worked high voltage electrical equipment and were exposed to hazards such as dust, methane, and roof falls." *Glover*, 19 F.M.S.H.R.C. at 1529, 1531. While acknowledging that the transfers changed neither the employees' job classifications nor their salary rates, the Commission nevertheless concluded that "[*b*]*ecause* the record established that work on the sections was more dangerous, we reject [the] assertion that the transfer was merely an action that the miners disliked." *Id.* at 1535 (emphasis added). Neither *Glover* nor any other Commission decision holds that job classification and the time required to complete the new job duties are *irrelevant* to the question of whether those duties constitute "adverse action." Rather, *Glover* recognizes that mine employees are frequently exposed to danger in greater or lesser measure irrespective of their job titles or working hours, and can thereby be subjected to "adverse action" in a different way (and one of particular salience to miners).

Thus, while the majority is correct to observe that an employer cannot insulate itself from liability in all cases simply by establishing that a miner's new duties are within his job classification and can be done in the time allotted, there is no basis for construing *Glover* as extending to situations in which the new duties are not more dangerous than the old. The Commission's decision in this case reflects this understanding; it explicitly compares Pendley's case to *Glover*, describing its prior holding as one in which a "transfer of miners [was] found to be unlawful where [the employees'] new position was less desirable *and more hazardous* and the adverse action

was motivated by protected activity." Comm'n Dec. at 21 (emphasis added). Certainly Pendley introduced no evidence—or even argued—that his duties on reassignment were more hazardous than those he had performed before. Therefore, there is no reason to believe that, in this case, Highland's reassignment of job duties vis-a-vis Pendley was anything more than "an action that [he] disliked."[1]

A case in which a miner is reassigned to significantly more dangerous duties that nevertheless fall within that miner's job description and can be performed within his assigned shift is a case that ought not, under Commission precedent, be dismissed for want of "adverse action." Such a case would squarely implicate the kind of retaliatory measures forbidden by the Mine Act. Such a case is not, however, *this* case. I respectfully dissent as to Parts II.b.2.A–C of the majority's opinion.[2]

---

[1]The majority appears to think I read *Glover* to mean that a within-classification reassignment can *never* be adverse action unless the new duties are more dangerous than the old, a conclusion "not mandated by the holding" in that case. *See* Maj. Op. at 14-15 n.5. I assert that such a conclusion is *not* required by *Glover*, but that is not the operative question in this case. According to both my understanding and the majority's, the question is whether "[t]he Commission's ruling as to Petitioner's job classification is *inconsistent with* Mine Act precedent." Maj. Op. at 14 (emphasis added); *see also* Maj. Op. at 8 ("The Court must . . . give *Chevron* deference to the Commission's reasonable interpretation of ambiguous provisions of the Mine Act."). I have found no Commission decision extending *Glover*'s rationale—itself explicitly predicated on an increase in the employee's greater exposure to physical harm—to situations in which the new job duties are not more dangerous than the old, nor does the majority cite to one. Thus, while the majority (and perhaps I) may think such an extension to be appropriate, the Commission's failure to do so in this case is not inconsistent with precedent, and is not error.

[2]The majority's reasoning in its Part II.b.2.C, "Evidence of Discriminatory Intent," is by its terms dependent on a finding that Pendley's new duties were "adverse action." Though its internal logic is sound, I dissent from it because I disagree with its premise.