RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0153p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CON-AG, INC.,

        *Petitioner*,

        *v.*

SECRETARY OF LABOR; MINE SAFETY AND HEALTH
ADMINISTRATION; FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION; LARRY GROVES,

        *Respondents*.

No. 17-4200

On Petition for Review from the Federal Mine Safety and Health Review Commission;
No. LAKE 2017-0117-DM.

Decided and Filed:  July 26, 2018

Before:  GILMAN, GIBBONS, and THAPAR, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  William R. Creedon, SCOTT SCRIVEN LLP, Columbus, Ohio, for Petitioner.  Ali
A. Beydoun, Edward Waldman, UNITED STATES DEPARTMENT OF LABOR, Arlington,
Virginia, for Respondent Secretary of Labor.

_____

### OPINION

_____

RONALD LEE GILMAN, Circuit Judge.  Con-Ag, Inc. petitions for review of a decision
by the Federal Mine Safety and Health Review Commission (the Commission) finding that Con-
Ag violated § 105(c) of the Federal Mine Safety and Health Act of 1977 (the Act), 30 U.S.C.
§ 815(c), by terminating Larry Groves's employment in retaliation for his reporting safety
concerns to the Mine Safety and Health Administration (MSHA), which enforces health and

safety standards at the nation's mines.  For the reasons set forth below, we **DENY** Con-Ag's petition for review.

## I.  BACKGROUND

**A.  Factual background**

Groves began working for Con-Ag in September 2015 at its surface limestone mine in St. Marys, Ohio.  He was fired by Con-Ag's owner and manager, John Hirschfeld, in August 2016. A review of the circumstances of Groves's employment and termination is necessary to determine whether substantial evidence supports the Commission's conclusion that the termination constituted unlawful retaliation under the Act.

Hirschfeld hired Groves on the recommendation of Groves's friend, Wesley Mann, who also worked for Con-Ag.  Groves was in charge of running the heavy equipment, including excavators and front-end loaders, as well as doing some maintenance work.  He usually worked the first shift, with only six or seven other employees, under the supervision of plant foreman Brian Henning.  When Henning was absent, Hirschfeld took over his duties.

Groves testified that he got along well with both his coworkers and with foreman Henning, and that before his termination he had had no problems with Hirschfeld.  Hirschfeld testified at the hearing before the Administrative Law Judge (ALJ) that Groves was a "middle of the road" employee who worked hard but was not a problem solver.  There is nothing in the record to show that Groves was ever disciplined for any reason while employed by Con-Ag, and Hirschfeld agreed that there were no problems with Groves's job performance or attendance beyond that Groves often left for lunch.  Groves rarely worked with his friend Mann, who was generally on the night shift at various other Con-Ag locations, but the two would socialize together once or twice a week at Groves's home.

During his employment, Groves made multiple safety-related complaints to MSHA, both over the phone and in writing.  The first written complaint occurred on May 24, 2016 during a routine spot inspection of the mine.  MSHA Inspector Joshua Grimes observed Groves excavating loose material from a highwall.  (A "highwall," as the Secretary of Labor explains in

his brief, is the "unexcavated face of exposed overburden and coal or ore in an opencast mine, or the face or bank on the uphill side of a contour strip mine excavation.") Inspector Grimes asked Groves who had instructed him to engage in this task, and to put his explanation of the event in writing. According to the signed letter that Groves submitted in response, Henning had originally asked Groves to position the excavator a safe distance from the highwall while removing the material. But Hirschfeld, who was working nearby, asked Groves to work closer to the wall. Groves felt that this was unsafe because some of the material was bigger than his excavator, and he was worried that the material would fall on him.

Con-Ag subsequently received a citation from MSHA, setting out the condition of the wall and loose material and the position of the excavator. MSHA explained that

> [t]his hazard exposed the miners to the falling material that could result in serious or fatal injuries. The mine owner/operator was working in the area and was aware of the condition and instructed miners to work at the base of the highwall. The owner/operator engaged in aggravated conduct constituting more than ordinary negligence. This violation is an unwarrantable failure to comply with a mandatory standard.

In accordance with confidentiality policies, Groves was not identified by name in the complaint, but he testified that both Henning and Hirschfeld saw him talking to Inspector Grimes. Hirschfeld did not dispute this contention, but added that all of his employees spoke with MSHA inspectors when the latter were onsite.

In July 2016, Groves provided MSHA with two more written complaints. The first letter was dated July 19, and it was typed by the inspector and signed by Groves. It stated that, on several occasions over the preceding few weeks, Groves had seen another employee climb into a primary crusher without first shutting it down, despite Groves explaining to the employee that this was very dangerous. The letter also asserted that the #27 cement truck, which had been involved in a roll-over accident on July 7, was used two or three times per week at the mine prior to the accident. According to Groves's testimony, the truck should not have been in use at the time because it was known to have brake problems. A second, undated letter from Groves contained substantially the same information as the first.

Groves was in contact with MSHA again on August 5, 2016, when he met offsite with MSHA Investigator Jason Dibble. The two discussed safety issues at the mine. Because the hour-and-a-half meeting exceeded his 30-minute lunch break, Groves told Henning about the meeting upon his return to work. Groves did not inform Hirschfeld about the meeting.

In addition to these specific incidents, Groves made a number of phone calls to MSHA representatives to report or discuss various safety issues at the mine. Groves also met with many, if not all, of the MSHA representatives who inspected the mine during Groves's employment. He testified that Hirschfeld saw him do this. Groves made similar oral complaints about safety issues to both Henning and Hirschfeld, but Hirschfeld did not believe that any of Groves's concerns were valid. When Groves made safety complaints to Henning, Henning's practice was to relate them to Hirschfeld.

On August 9, 2016, the night before Groves was fired, an incident occurred between Groves and Mann at Groves's home. Groves and Mann provided conflicting testimony regarding this incident, but after hearing their testimony and that of a neighbor, the ALJ ultimately credited Groves's version.

According to Groves, he and his wife were out on their porch when Mann came by on the evening of August 9. Groves's wife went inside shortly after Mann arrived, and the two men were joined on the porch by Groves's neighbor, Trey Huber. They had a few beers and discussed work. An argument then ensued between Groves and Mann over safety at the mine. Groves testified that Mann "flipped out," and Groves asked him to leave. He further testified that Mann threatened him, rather than the other way around. Huber corroborated Groves's contention that Mann was the aggressor, explaining that the two discussed work and MSHA, and the discussion escalated into an argument over who could run a piece of equipment better. According to Huber, Mann "got mad and started saying that he was going to harm Mr. Groves. And Mr. Groves asked [Mann] to leave, and [Mann] went and got in his car the whole time screaming and yelling, 'I'm going to whoop your butt.'" According to Huber, Groves never threatened Mann.

Mann, like Huber, testified that he and Groves argued over who could operate a piece of equipment better. But from there the two men's testimony departed, with Mann saying that Groves became angry and began threatening to beat up and kill him. Mann testified that he did not retaliate, but left immediately because he felt that his safety was being threatened.

On his way home, Mann pulled over and called the police to report that Groves had threatened to beat him up. A dispatch log report from the St. Marys Police Department reflects that Mann reported the threat, but Mann declined to come into the station and file a report. Mann then drove the rest of the way to his home and, once there, called the general phone line at Con-Ag, leaving the following message for Hirschfeld:

> Hello. Uh, this message is for John [Hirschfeld]. Uh, this is Wesley Mann. Umm. This is uh, in referral to, uh, Larry Groves. Uh, he's in some trouble tonight. I wanted to let you know you might want to ask him about it tomorrow. Uh, he threatened my life. Ah, he's starting a lot of trouble. You might want to ask him about it before you keep him employed, uh. He's crooked–crooked dude. He's going to lie about John. He wants to stab John in the back. Give this message to John. Thank you. M'bye.

According to Mann, he meant the use of the phrase "stab John in the back" figuratively; Groves never threatened physical violence against Hirschfeld, and Mann never told the police or Hirschfeld that Groves had done so. Mann testified, however, that Groves "was very unappreciative of working for [Hirschfeld]" and had made disparaging remarks about him on the evening of August 9, including that Hirschfeld, "[d]idn't know what he was doing . . . [and was] going to run the company in the ground."

Hirschfeld listened to the message when he arrived at work the following morning. He testified at the administrative hearing that, when he heard the message, he understood the words "stab . . . in the back" to mean that Groves had physically threatened him. Hirschfeld said that he was "taken aback" and "stunned," his mind racing. The best thing to do, he believed, would be to get Groves off the worksite. The following text-message exchange between Hirschfeld and Groves ensued:

| 8:10 a.m. | Hirschfeld: "Do not come into work." |
| 8:11 a.m. | Groves: "All ready here won't [sic] me to go home." |
| 8:11 a.m. | Hirschfeld: "Yes." |
| 8:13 a.m. | Groves: "Am I working tomorrow." |
| 8:13 a.m. | Hirschfeld: "I don't know yet." |
| 8:38 a.m. | Hirschfeld: "No work tomorrow." |
| 8:56 a.m. | Hirschfeld: "I'll mail you on paperwork today, don't come back in." |
| 8:57 a.m. | Groves: "What did I do." |
| 8:57 a.m. | Hirschfeld: "Fwd: I'll mail you on paperwork today, don't come back in." |
| 9:25 a.m. | Groves: "Why don't you won't [sic] me to come back I didn't do anything wrong you have to have a reason." |

Groves left immediately when asked by Hirschfeld. Hirschfeld never spoke to Groves about the reasons for his discharge or asked Groves for an explanation of the incident with Mann.

Hirschfeld did, however, consult with several other "key" individuals before deciding to terminate Groves. He called Mann and asked him what had happened on the evening of August 9, but did not ask him any additional questions. Hirschfeld then called Henning and told him about the allegations and discussed discharging Groves. Finally, Hirschfeld spoke with Sylvia (the company's bookkeeper) and Terri (Hirschfeld's sister and Con-Ag's vice president). He did not, however, contact the police. And, according to Hirschfeld's testimony, he considered that Mann might have been under the influence of alcohol when he left the message on the night of the incident. But he also testified that he trusted Mann.

Hirschfeld sent discharge paperwork to Groves, dated August 9, 2016, stating that Groves was being "discharged for threatening people . . . at work to kill them. Co-workers. Threats were made after hours. I do not feel comfortable with him working here." Hirschfeld testified that he believed Groves's discharge was justified because he had "to protect people at the workplace. . . . When somebody has threatened to kill somebody else, you're gone."

The company handbook states that Con-Ag "prefers that progressive disciplinary action be applied to violations of work rules," but that serious offenses such as "threatening another

employee, supervisor or manager" "may result in immediate discharge, even for a first offense." It further provides that harassment of any kind is prohibited and

> [i]f you feel that you have been harassed by . . . anyone you deal with through the course of performing your job, report the incident immediately. . . .

> The company will immediately conduct a thorough and complete investigation of the incident. Should there be a determination that harassment has occurred, the offending party(s) will be disciplined appropriately, up to and including termination.

And finally, the handbook prohibits "making false, vicious or malicious statements concerning any employee, suppliers or customers[,] the company management, or its products or methods of manufacturing . . . ."

## B. Procedural background

Groves filed a discrimination complaint with the Secretary of Labor on September 22, 2016. MSHA conducted an investigation and concluded that discrimination had occurred. Accordingly, the Secretary filed a complaint with the Commission on behalf of Groves. *See* 30 U.S.C. § 815(c)(2) (providing that "[a]ny miner[] who believes that he has been discharged . . . in violation of this subsection [of the Act] may . . . file a complaint with the Secretary [of Labor] . . . [who] shall cause [an] investigation to be made as he deems appropriate . . . [and,] [i]f upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall immediately file a complaint with the Commission"). Con-Ag requested an administrative hearing, which was held on June 21, 2017. Following the hearing, the ALJ issued an opinion finding that Con-Ag terminated Groves in retaliation for protected activity and in violation of the Act. The ALJ ordered that Con-Ag pay a civil penalty of $10,000, pay damages in the amount of $40,414.47, and reinstate Groves to his former position.

Con-Ag filed a petition for discretionary review by the Commission pursuant to 30 U.S.C. § 823(d)(2). The Commission denied review, making the ALJ's decision the final administrative decision of the Commission. *See* 30 U.S.C. § 823(d)(1). Con-Ag then filed a petition for reconsideration with the Commission, which was also denied. This timely appeal followed. *See* 30 U.S.C. § 816(a)(1) (providing that decisions of the Commission are appealable

to the United States court of appeals for the circuit in which the violation is alleged to have occurred).

## II.  ANALYSIS

### A.  Standard of review

"Under the Mine Act, this court 'reviews the Commission's application of law *de novo*,' but the Commission's factual findings will be found conclusive if they are supported by substantial evidence."  *Cumberland River Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 712 F.3d 311, 317 (6th Cir. 2013) (quoting *Pendley v. Fed. Mine Safety & Health Review Comm'n*, 601 F.3d 417, 422–23 (6th Cir. 2010)).  "The threshold inquiry in determining the substantiality of the evidence is 'whether there is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion.'"  *Id.* (quoting *Pendley*, 601 F.3d at 423); *see also Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 337 (6th Cir. 2014) (noting that "substantial evidence" means "more than a scintilla, but less than a preponderance, of the evidence," and that the "substantial evidence standard is highly deferential").

### B.  Prima facie case

Discrimination claims under the Act are analyzed using the *Pasula–Robinette* framework. *Cumberland*, 712 F.3d at 317–18 (citing *Sec'y of Labor ex rel. Pasula v. Consolidation Coal Co.*, 2 FMSHRC 2786 (Oct. 14, 1980)*, rev'd on other grounds*, 663 F.2d 1211 (3d Cir. 1981), and *Sec'y of Labor ex rel. Robinette v. United Castle Coal Co.*, 3 FMSHRC 803 (Apr. 3, 1981)).  To establish a prima facie case of discrimination under this framework, "a miner must show that he was:  (1) engaging in protected activity, and (2) subject to an adverse employment action that was at least partially motivated by his protected activity."  *Id.* at 318.  "The mine operator may rebut the prima facie case by showing either that no protected activity occurred or that the adverse action was in no part motivated by protected activity."  *Pendley*, 601 F.3d at 423 (quoting *Driessen v. Nev. Goldfields, Inc.*, 20 FMSHRC 324, 328 (Apr. 9, 1998)).

Con-Ag concedes that Groves engaged in protected activity under the Act when he provided information to MSHA regarding safety issues at the mine.  But Con-Ag contends that

the ALJ's finding that Groves's termination was motivated by his engagement in this protected activity is not supported by substantial evidence. We disagree.

"[D]irect evidence of actual discriminatory motive is rare. Short of such evidence, illegal motive may be established if the facts support a reasonable inference of discriminatory intent." *Sec'y of Labor ex rel. Howard v. Cumberland River Coal Co.,* 34 FMSHRC 1396, 1397 (June 15, 2012); *see also NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1479 (6th Cir. 1993) (noting that, in the context of unfair labor practices, "[r]arely is there direct evidence that the employer's animus actually caused a layoff decision," and therefore courts may properly consider other evidence).

The Commission has generally looked to four factors in determining whether a causal connection exists between protected activity under the Act and an adverse employment action: "(1) the mine operator's knowledge of the protected activity; (2) the mine operator's hostility or 'animus' towards the protected activity; (3) the timing of the adverse action in relation to the protected activity; and (4) the mine operator's disparate treatment of the miner." *Cumberland*, 712 F.3d at 319; *see also Sec'y of Labor ex rel. Chacon v. Phelps Dodge Corp.,* 3 FMSHRC 2508, 2510–12 (Nov. 13, 1981), *rev'd on other grounds,* 709 F.2d 86 (D.C. Cir. 1983). This court has recognized that a "coincidence in time between the protected activity and the adverse action" may alone be sufficient to establish discriminatory intent. *See Pendley*, 601 F.3d at 427 (quoting *Sec'y of Labor ex rel. Garcia v. Colo. Lava, Inc.*, 24 FMSHRC 350, 354 (Apr. 30, 2002)).

In this case, the ALJ did not find any direct evidence of animus or disparate treatment. But she found the factors of timing and knowledge to be persuasive. With respect to the timing factor, Groves made his first complaint—regarding the removal of loose material from the highwall—approximately two-and-a-half months before his discharge. And Groves's meeting with the MSHA investigator in August occurred just five days before he was fired, a fact that the ALJ found "particularly noteworthy." We agree that the timing of Groves's discharge in relation to these protected activities supports a finding of discriminatory intent. *See Metz v. Carmeuse Lime, Inc.*, 34 FMSHRC 1820, 1825–26 (Aug. 9, 2012) (finding that a miner's termination two to three weeks after making safety-related complaints was a sufficient coincidence of time to support a prima facie case of discrimination); *Phelps Dodge*, 3 FMSHRC at 2511 (finding that

coincidental timing showed an illegal motive where the miner received a warning within one-and-a-half months after contacting MSHA with safety concerns and only four days after participating in a safety-grievance meeting resulting from a complaint signed by 72 employees).

The ALJ then turned to the knowledge factor.  *See Phelps Dodge*, 3 FMSHRC at 2510 ("The operator's knowledge of the miner's protected activity is probably the single most important aspect of a circumstantial case [of discrimination].").  Although the ALJ recognized that there might not be sufficient evidence to infer that Hirschfeld knew of Groves's July 2016 letters, she found that Hirschfeld at least knew of the May 24 complaint and the August 5 meeting.  Con-Ag disputes this finding, highlighting a perceived lack of evidence that Hirschfeld knew of either activity before he discharged Groves, and arguing that any inference of such knowledge was unreasonable.

Like discriminatory intent itself, an employer's knowledge of a miner's protected activity can be shown by circumstantial, rather than direct, evidence.  *Phelps Dodge*, 3 FMSHRC at 2510 ("Because subjective factors are involved, the operator's knowledge—like the overall question of motivations itself—can be proved by circumstantial evidence and reasonable inferences.").

In this case, the ALJ relied on the fact that Hirschfeld was aware that Groves, as well as Con-Ag's other employees, spoke at various times with MSHA inspectors and investigators.  And from May through July 2016, Con-Ag received 89 citations from MSHA.  Groves also frequently raised concerns about safety issues at the mine to both Hirschfeld and Henning, supporting an inference that Hirschfeld believed that Groves was making repeated safety complaints to MSHA representatives.

With respect to the specific May 24 complaint and accompanying citation, Groves testified that Henning and Hirschfeld saw him speak with Inspector Grimes.  The ALJ further found that although the citation did not specifically identify Groves, it still would have alerted Hirschfeld to Groves's conversation with the inspector because it specifically referred to Groves's excavation work and to Hirschfeld's direct instructions to move closer to the highwall.

Con-Ag contends that this was an unreasonable inference for the ALJ to make because the MSHA inspectors talked to everyone on site and anyone could have made the complaint

about excavating close to the highwall. We disagree. Con-Ag has identified no evidence in the record that any other employees were present during the incident, and the citation refers to Hirschfeld's specific instruction to Groves to work closer to the wall. This was sufficient evidence for the ALJ to conclude that Hirschfeld was aware of Groves's complaint regarding the May 24 incident. *See Sec'y of Labor v. Mid-Continent Res., Inc.*, 6 FMSHRC 1132, 1138 (May 30, 1984) ("The possibility of drawing either of the two inconsistent inferences from the evidence [does] not prevent [an agency] from drawing one of them . . . ." (alterations in original) (quoting *NLRB v. Nev. Consol. Copper Corp.*, 316 U.S. 105, 106 (1942))).

The ALJ also found that Hirschfeld knew of Groves's August 5, 2016 meeting with Investigator Dibble because Groves told Henning about the meeting and because Hirschfeld consulted with Henning before deciding to fire Groves. Con-Ag contends that this finding was unreasonable because Hirschfeld spoke with Henning only *after* Hirschfeld fired Groves via text message, but this contention is not supported by the record. Hirschfeld never said that he spoke with Henning only after sending Groves the text message about mailing Groves's paperwork. To the contrary, Hirschfeld testified clearly that he spoke with Henning as part of his investigation into the August 9 incident.

The ALJ reasonably imputed Henning's knowledge of the August 5 meeting between Groves and Inspector Dibble to Hirschfeld. *See Evans v. Prof'l Transp., Inc.*, 614 F. App'x 297, 303 (6th Cir. 2015) (explaining in a case brought under the Fair Labor Standards Act that, "[t]o be sure, 'knowledge of a plaintiff's protected activity can be inferred from evidence of the *prior* interaction of individuals with such knowledge and those taking the adverse employment action'" (emphasis in original) (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 553 (6th Cir. 2002))); *Metz v. Carmeuse Lime, Inc.*, 34 FMSHRC 1820, 1826 (Aug. 9, 2012) (concluding that the ALJ "properly imputed the [supervisors'] knowledge of [the miner's] protected activities to the . . . corporate officials who decided to terminate [the miner]," and noting that "the small size of a mine supports an inference that an operator was aware of a miner's protected activity"); *Turner v. Nat'l Cement Co. of Cal.*, 33 FMSHRC 1059, 1067 (May 20, 2011) (imputing knowledge of the miner's protected activity to the plant manager when the manager consulted with individuals who knew of the activity before he fired the miner, and explaining that "[a]n operator may not

escape responsibility by pleading ignorance due to the division of company personnel functions" (quoting *Sec'y of Labor v. Metric Constructors, Inc.*, 6 FMSHRC 226, 230 n.4 (Feb. 29, 1984))).

The ALJ's conclusion that Hirschfeld knew of the August 5 meeting is therefore supported by substantial evidence. And because an employer's knowledge of protected activity and the close proximity in time between that protected activity and the miner's discharge are sufficient to establish discriminatory intent, the ALJ's broader conclusion—that discrimination was at least one of the causes of Groves's discharge—is also supported by substantial evidence.

Con-Ag's rebuttal of the prima facie case of discrimination failed to persuade the ALJ. The company argued that Hirschfeld discharged Groves solely because of the alleged threats that Groves made to Mann and that, as reflected in the company handbook, Con-Ag's policy permitted the immediate discharge of an employee who threatens a coworker. For reasons discussed in greater detail below, the ALJ found Hirschfeld's testimony that he fired Groves based on the August 9 incident not credible because Hirschfeld made only a cursory investigation into the incident and never discussed the matter with Groves.

A credibility decision by an ALJ should not be disturbed by a reviewing appellate court unless it has "no rational basis." *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003) (quoting *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 242 (6th Cir. 1993)); *see also Mountain States Contractors, LLC v. Perez*, 825 F.3d 274, (6th Cir. 2016) (reviewing a decision by the Occupational Safety and Health Review Commission and noting that "[t]his Court does not set aside the credibility determinations of an ALJ 'unless found to be inherently incredible or patently unreasonable'" (quoting *Absolute Roofing & Constr., Inc. v. Sec'y of Labor*, 580 F. App'x 357, 360 (6th Cir. 2014))). Con-Ag has offered no persuasive reason to overturn the credibility decision here. We therefore find that substantial evidence supports the ALJ's conclusion that Con-Ag failed to rebut the prima facie case of discrimination.

## C.  Con-Ag's affirmative defense

"A mine operator can establish an affirmative defense under the *Pasula–Robinette* framework by showing that 'while it took adverse action against the miner because of the miner's protected activity, it would have taken the action even if the miner had not engaged in

protected activity.'" *Cumberland River Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 712 F.3d 311, 319 (6th Cir. 2013) (quoting *Pendley v. Fed. Mine Safety & Health Review Comm'n*, 601 F.3d 417, 423–24 (6th Cir. 2010)). "The mine operator can show this by: (1) past discipline of [the] miner, (2) unsatisfactory past work record, (3) prior notices for unacceptable behavior, or (4) the miner's noncompliance with personnel rules." *Id.* Con-Ag does not contend that any of the first three situations are at play in this case. Instead, it argues that Hirschfeld would have fired Groves regardless of his protected activity because he broke a company rule that prohibits threatening coworkers and provides that the violation may result in immediate discharge.

"When a mine operator asserts its affirmative defense, the threshold inquiry is 'whether [the affirmative defense is] credible and, if so, whether [it] would have motivated the particular operator as claimed.'" *Cumberland*, 712 F.3d at 319 (alterations in original) (quoting *Bradley v. Belva Coal Co.*, 4 FMSHRC 982, 993 (June 4, 1982)). "[T]he inquiry is limited to whether the reasons are plausible, whether they actually motivated the operator's actions, and whether they would have led the operator to act even if the miner had not engaged in protected activity." *Pendley*, 601 F.3d at 425.

An ALJ may not "impose [his or her] own business judgment as to an operator's actions." *See id.* But this "restrained" review does not mean that the operator's justification "should be examined superficially or be approved automatically once offered." *Cumberland*, 712 F.3d at 320 (quoting *Haro v. Magma Copper Co.*, 4 FMSHRC 1935, 1938 (Nov. 30, 1982)). A justification might be "so weak, so implausible, or so out of line with normal practice" that it should be found to be "mere pretext." *Sec'y of Labor ex rel. Chacon v. Phelps Dodge Corp.*, 3 FMSHRC 2508, 2516 (Nov. 13, 1981).

Con-Ag argues that, by rejecting its affirmative defense, the ALJ was impermissibly imposing her own business judgment on Con-Ag's decision to discharge Groves. Specifically, the company contends that the ALJ relied on her own business judgment when considering (1) the adequacy of Con-Ag's investigation into the August 9 incident, and (2) whether Groves's discharge was in line with company policy as laid out in the handbook.

But the rule against substituting one's own business judgment for that of the operator simply means that the ALJ may not "pass on the wisdom or fairness" of the operator's proffered justification. *Bradley*, 4 FMSHRC at 993. For example, in *Bradley*, the Commission admonished the ALJ for suggesting that the miner's discharge was "totally disproportionate to the sanction" because "[s]uch personal views" from the ALJ were "irrelevant." *Id.* at 994. Stated differently, the relevant adjudicator must not assess the operator's asserted justification based on his or her "own view" of whether the "asserted justification was 'enough' to support the adverse action," but rather based on what the evidence shows that "the operator actually believed at the time." *Pendley*, 601 F.3d at 426.

A review of the ALJ's decision makes clear that she did not reject Con-Ag's defense based on her own perceptions of the wisdom or fairness of discharging Groves for allegedly threatening another employee while offsite. Rather, she found Hirschfeld's testimony so implausible as to be not credible and thus disbelieved his contention that he would have fired Groves based on the August 9 incident alone. The ALJ discussed and relied on substantial evidence for this credibility finding.

One of the key facts that the ALJ relied on was the cursory nature of Hirschfeld's investigation into the August 9 incident. To the ALJ, "[t]he fact that [Hirschfeld] accepted Mann's account of the incident without speaking to Groves first especially st[ood] out." The ALJ also emphasized that Hirschfeld did not "attempt to ascertain the motive underlying Mann's phone message to him." And she further noted that within an hour of listening to Mann's message on August 10, Hirschfeld had sent Groves "text messages telling him not to come back to work and that he would send discharge paperwork."

Con-Ag contends that the ALJ had no basis to infer that Hirschfeld's text message regarding "paperwork" referred to discharge paperwork and thus to conclude that Hirschfeld's investigation of the incident was unreasonably brief. But Con-Ag does not offer any alternative explanation of what other "paperwork" Hirschfeld was referring to, and the record shows that the discharge paperwork was dated August 9 and received by Groves several days later. Accordingly, we conclude that this was not an unreasonable inference.

Hirschfeld, then, was found to have decided within an hour of receiving Mann's message to discharge Groves, after speaking only with Mann, Henning, Sylvia, and Terri. Among these individuals, the only one with knowledge of the incident was Mann. And although Hirschfeld testified that he trusted Mann, he also acknowledged the possibility that Mann was under the influence of alcohol when he left the voice message.

The ALJ further observed that Hirschfeld's failure to conduct a meaningful investigation into Mann's allegations was inconsistent with Con-Ag's policy, as laid out in the handbook, to "conduct a thorough and complete investigation" into any incident of harassment alleged by an employee. As Con-Ag argues, this last observation is an incorrect reading of Con-Ag's handbook. The handbook requires Con-Ag to investigate allegations of harassment but does not explicitly require investigations into allegations of threats. But this error does not undermine the ALJ's analysis. A review of her opinion shows that the "unreasonably brief" nature of the investigation itself, not the alleged failure to comply with the handbook, is what led the ALJ to find Hirschfeld's testimony not credible.

The cursory nature of Hirschfeld's investigation became more significant when the ALJ considered that there was no evidence in the record that Groves had any history of violence, threatening behavior, or discipline whatsoever. And although Hirschfeld learned from Henning that Groves had had a previous "altercation with somebody else," there is no evidence that Hirschfeld knew any details about or believed Groves to have been the aggressor in the incident. In fact, the only evidence on this issue shows that Groves was not the aggressor in this earlier altercation.

Hirschfeld's testimony that his sister, Terri, reported feeling threatened by Groves after the incident between Groves and Mann was also considered by the ALJ. But the ALJ noted that Hirschfeld provided no explanation or basis for why Terri felt that way, and Terri herself did not provide any statement in the case. Moreover, there is no evidence in the record that any other employee ever reported feeling threatened by Groves.

The ALJ further noted that the evidence proffered by Con-Ag shows that other employees have been terminated only for reasons related to attendance and safety. Despite

Hirschfeld's own statement that his employees generally are part of a "rougher crowd," there is no evidence that Con-Ag has ever disciplined, let alone discharged, any employee for making threatening statements either on or off the worksite.

The ALJ also found that Hirschfeld's testimony regarding his reaction to Mann's message to be disingenuous. Hirschfeld testified that he interpreted Mann's voicemail statement that Groves would "stab him in the back" literally, as a physical threat against him (Hirschfeld). But the popularity of that idiom led the ALJ to "find it highly unlikely that a person in Hirschfeld's position would be unfamiliar with [its] nonliteral usage." And the context of Mann's use of the idiom makes it even more unlikely that an individual in Hirschfeld's shoes would interpret the statement as a literal threat: "He's crooked—crooked dude. He's going to *lie* about John. He wants to stab John in the back." (Emphasis added.) Mann also testified that he never believed or reported to anyone that Groves had made a physical threat against Hirschfeld. So even if Hirschfeld had initially taken the statement as a physical threat against him, he would have learned the truth when he called Mann and Mann explained the incident. Hirschfeld also ultimately acknowledged during his testimony that Mann did not mean the phrase "stab in the back" as a literal threat.

The ALJ expressed no view about whether firing Groves based on the alleged threats against Mann was wise or fair. Instead, she concluded that Hirschfeld's testimony that he would have fired Groves based on the alleged threats alone was implausible and thus not credible. The ALJ's adverse credibility finding also undermines Con-Ag's argument that the honest-belief rule applies in this case because the finding suggests that Con-Ag could not have "honestly believed in the proffered reason given for its employment action." *See Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (explaining that "so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless").

The ALJ therefore did not impose her own business judgment on Hirschfeld's proffered justification for firing Groves. Because substantial evidence supports her determination that Con-Ag's reason for terminating Groves was pretextual, she did not err by concluding that

Con-Ag discriminated against Groves when it discharged him based on his engagement in protected activity.

**D. Relief**

### 1. Calculation of damages

Con-Ag next argues that the ALJ denied it "the right to present its case or defense as was required for a full and true disclosure of the facts regarding back pay calculations." *See* 29 C.F.R. § 2700.63(b) (explaining that in hearings brought under the Act, "[a] party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of facts"). Accordingly, Con-Ag contends that the ALJ's determination of damages should be vacated and a new hearing should be held at which Con-Ag may present evidence about the correct calculation of damages in this case.

A review of the record, however, reflects that the ALJ gave Con-Ag more than an ample opportunity to present its own evidence related to the correct calculation of damages in this case. On April 26, 2017, after settlement talks had proved unfruitful, the ALJ asked the parties to "submit a calculation of back pay and damages and tell [her] where [they] can agree to amounts and where [they] cannot." She then set a five-day deadline for submitting those calculations. The Secretary timely submitted his calculation to the ALJ and Con-Ag, but Con-Ag did not submit any calculation of its own or object to the one provided by the Secretary. In a follow-up email on May 10, the ALJ asked Con-Ag to "[p]lease look at the back wage computation and tell me if and where you disagree. If you disagree, provide a copy of your calculations so I can see what you believe the back wage amount to be." When on May 31 she still had not received any information about the backpay calculation from Con-Ag, the ALJ sent the following message:

> I . . . note that [Con-Ag] has not provided a response to my request for comment and calculation of back pay. I have asked twice and have received nothing, therefore, the back pay calculations provided by the Secretary are accepted and should I find that Con-Ag violated section 105(c) of the Act, I will assess the back pay according to the calculation provided. No further evidence will be necessary at [the] hearing.

There is no evidence in the record that Con-Ag responded to any of the ALJ's requests or otherwise asked to delay submitting evidence related to damages until the hearing.

At the administrative hearing, the ALJ advised the parties before the lunch break that they would "take up [the backpay calculation] later [that] day." After the lunch break, the ALJ noted that she had heard nothing back from Con-Ag related to her requests for backpay calculations, but that she was "going to give [Con-Ag] one more chance." She then asked Con-Ag's attorney if he believed that there were any errors in the backpay calculation provided by the Secretary. Con-Ag's attorney told the ALJ that he had previously reviewed the Secretary's calculation with Hirschfeld, took several minutes to again briefly discuss the calculation with Hirschfeld while the ALJ waited, and reported back to the ALJ that: "No; we have no further information." Notably, Con-Ag's attorney did not make any argument to the ALJ that Con-Ag had not had an adequate opportunity to submit evidence related to the backpay calculation or to consider the calculation provided by the Secretary.

Con-Ag now argues that it had strategic reasons for not submitting any calculation of backpay when first asked by the ALJ, and that it later believed it was unable to submit evidence related to the calculation at the hearing based on the ALJ's email that no such information would be "necessary." It contends that it was therefore deprived of a meaningful opportunity to present such evidence. But if Con-Ag had strategic reasons for declining to submit evidence related to backpay, it should have raised the issue with the ALJ at the hearing or in its petitions to the Commission for discretionary review and reconsideration. There is no evidence that it did so.

Con-Ag's failure to present evidence relating to the backpay calculation resulted not from any lack of a meaningful opportunity to provide such evidence, but rather from its own decision not to take advantage of the numerous opportunities provided. And because Con-Ag failed to submit its own damages calculation to the ALJ or to object to the calculation accepted by the ALJ (either before the ALJ or the Commission), we will not consider Con-Ag's objection to the calculation of damages raised now for the first time on appeal. *See* 30 U.S.C. 816(a)(1) ("No objection that has not been urged before the Commission shall be considered by [a United States Court of Appeals reviewing a Commission decision], unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

*2. Reinstatement*

Con-Ag's final argument is that Hirschfeld cannot possibly reinstate Groves to his former position at Con-Ag because Con-Ag no longer owns the mine, so the ALJ's order of reinstatement is improper and should be vacated.  But Con-Ag provides no proof that it no longer owns the mine beyond citations to testimony from Mann and Hirschfeld at the hearing.  These statements are equivocal as to who owns and operates the mine.  Hirschfeld testified that "Con-Ag . . . was started in 1980, and we've been mining there since."  And Con-Ag and its parent company, Quality Ready Mix, continue to exist, although Hirschfeld stated that "all the crushing at Con-Ag [was] turned over to another company called Cornerstone Crushing" shortly after Groves was fired.

If Con-Ag truly cannot comply with the order for reinstatement, it can raise this issue with MSHA.  We decline to vacate the remedy on appeal based on unclear testimonial evidence. The issue can be definitively decided by sale and ownership records not provided here.  And if, as Con-Ag argues, Groves does not wish to be reinstated, he may choose to decline the position. But the fact that he might choose to decline the position does not render the remedy improper. *See* 30 U.S.C. § 815(c)(3) (providing that the Commission may "grant[] such relief as it deems appropriate, including, but not limited to, an order requiring the rehiring or reinstatement of the miner").

## III.  CONCLUSION

For all of the reasons set forth above, we **DENY** Con-Ag's petition for review.